UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------- x
V.B., as Conservator of S.B.,                         :
                                                      :
                                  Plaintiff,          :
                                                      :        **MEMORANDUM &**
                  -against-                            :        **ORDER**
                                                      :
MONROE BOARD OF EDUCATION,                             :        3:22-CV-00174 (VDO)
                                                      :
                                  Defendant.          :
----------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

Plaintiff, V.B., conservator and parent of disabled child S.B., brings this action against

the Monroe Board of Education (the "Board") for violations of the Individuals with Disabilities

Education Act ("IDEA"). Before the Court are Plaintiff's and Defendant's Cross-Motions for

Summary Judgment (ECF Nos. 82 and 83, respectively, together the "Motions"). The Court

has reviewed the briefing on the Motions, the Administrative Record, and the record in this

matter. After careful review, and for the reasons that follow, the Court **GRANTS** Plaintiff's

Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.

I.      **BACKGROUND**

        A.      **Statutory Background**

        Because the facts relevant to the Motions involve decisions made pursuant to the IDEA,

the Court begins with a brief overview of that statute. The Second Circuit has characterized

IDEA as part of "an ambitious federal effort to promote the education of handicapped

children." *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005) (cleaned up). As

part of IDEA, Congress "offers federal funds to states that demonstrate, inter alia, that they

have developed plans to assure 'all children with disabilities residing in the state' a 'free

appropriate public education'" (hereinafter "FAPE"). *Id.* (quoting *Mackey v. Board of Educ.,* 386 F.3d 158, 159–60 (2d Cir. 2004) and 20 U.S.C. § 1412(a)(1)(A)). IDEA "expresses a strong preference for disabled children to be educated, to the maximum extent appropriate, together with their non-disabled peers and, accordingly, requires special education and related services to be provided in the least restrictive setting consistent with a child's needs." *Id.* (cleaned up).

"The centerpiece of the IDEA's education delivery system is the 'individualized education program,' or 'IEP.'" *Murphy v. Arlington Cent. Sch. Dist. Board of Educ.,* 297 F.3d 195, 197 (2d Cir. 2002) (cleaned up); *see also* 20 U.S.C. § 1414(d) (defining and describing the development, review, and revision of an IEP). "The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Murphy*, 297 F.3d at 197 (cleaned up). In Connecticut, each child eligible for special education under the IDEA is assigned a Planning and Placement Team ("PPT"), which is responsible for evaluating the child and developing their IEP. *See* Conn. State Regs. § 0-76d-10. Connecticut thus also refers to IEP meetings as PPT meetings.

IDEA requires a comprehensive initial evaluation to develop the IEP and reevaluations at least once every three years (the "Triennial Reevaluation" or, simply, the "Triennial"). *D.S. By & Through M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 157 (2d Cir. 2020) (citing 20 U.S.C. § 1414). A school district can forego the Triennial if a student's PPT agrees that new evaluations are not needed to determine appropriate services for the student's IEP. *Id.* "As a

procedural safeguard," including in situations where a parent of a child with a disability disagrees with a school district's failure to perform such reevaluations, that parent "has an absolute right to obtain an [independent educational evaluation ("IEE")] of their child…." *Id.* at 157–58 (quoting 34 C.F.R. § 300.502(a)(1)). "The school must consider that IEE 'in any decision made with respect to the provision of FAPE to the child.'" *Id.* (quoting 34 C.F.R. § 300.502(c)(1); *see also* Conn. State Regs. 10-76d-9(a).

When a dispute arises, an organization or individual may file a "state complaint" alleging a violation of any Part B requirement by a public agency. *See* 34 C.F.R. §§ 300.151–53. The state educational authority must investigate the complaint, provide an opportunity to submit additional information, and issue a final written decision containing findings of fact, conclusions, and reasons. *See* 34 C.F.R. § 300.152. The written decision may include procedures for the effective implementation of the decision, potentially including corrective actions. *See* 34 C.F.R. § 300.152(b). Under the procedure established by the Connecticut State Department of Education ("CSDE"), the final decision on such a complaint cannot be appealed. *See* CSDE, Special Education Complaint Resolution Process, https://www.portal.ct.gov/-/media/sde/special-education/complaint-resolution-process.pdf, (last visited Mar. 29, 2026).

Alternatively, parents and school districts may request a "due process hearing" relating to a proposal or refusal to change a child's identification, evaluation, educational placement, or the provision of FAPE. *See* 20 U.S.C. § 1415(b)(6), (f), (h); 34 C.F.R. §§ 300.507–15; Conn. Gen. Stat. § 10-76h. The hearing request must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action. 20 U.S.C. § 1415(b)(6)(b). An impartial hearing officer must conduct a hearing

at which the parties are entitled to introduce testimony and written evidence. 34 C.F.R. §§ 300.511–12. The hearing officer then must issue a written final decision, and any aggrieved party may appeal to state or federal court. *See* 20 U.S.C. § 1415(i)(2); Conn. Gen. Stat. 10-76h(d)(4).

Parties wishing to challenge the findings of a hearing officer in an IDEA hearing are entitled to bring a civil action in federal court pursuant to 20 U.S.C. § 1415(i)(2)(A). *See M.H. v. N.Y.C Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012). IDEA appeals are typically resolved via cross-motions for summary judgment. In substance, the procedure is an appeal from an administrative determination. *Id.* at 226; *see also R.R. v. Greenwich Bd. of Educ.*, No. 21-CV-873 (JCH), 2023 WL 3737714, at *7 (D. Conn. May 31, 2023) ("The motion [for summary judgment] serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits…The court must grant such relief as it determines is appropriate, based on a preponderance of evidence.") (cleaned up).

### B.    Factual Background

S.B. is a student who, at the time of events relevant to the instant matter, was residing in the Defendant's school district.[1] During the time of the underlying proceedings and at the

---

[1] ECF No. 55-2 at 665–78. The Court draws the following facts largely from the Administrative Record ("A.R.") in this matter, as well as transcripts of the underlying agency proceedings. The A.R. consists of what was filed at ECF Nos. 55-1 and 55-2. It was latter supplemented by exhibits at ECF Nos. 39-5, 39-6, 39-7, 39-9, and 39-10, pursuant to this Court's order at ECF No. 57, as well as ECF No. 100, per this Court's order at ECF No. 94. The relevant transcripts appear at ECF No. 53. When citing to the A.R. or transcripts, the Court refers to ECF pagination.

The Board's request to supplement the administrative record with ECF No. 103-1, Exhibit A, is denied. *See* ECF No. 103 at 4. The letter, seemingly from S.B.'s current educational placement,

commencement of the instant action, he was a minor, and this action was brought by his parents, V.B. and R.B. as his next friends.[2] Following S.B.'s eighteenth birthday, the Court permitted his mother, V.B., to proceed with the suit as S.B.'s conservator.[3]

S.B. is eligible for special education with a primary disability of specific learning disabilities and dyslexia. He is also diagnosed with autism, attention deficit-hyperactivity disorder, auditory processing disorder, generalized anxiety disorder, obsessive compulsive disorder, and depression.[4] S.B. attended Southport School for fifth and sixth grade (the 2018–19 and 2019–20 academic years, respectively), completing the sixth grade in June of 2020.[5] S.B. was then enrolled in the Easton Country Day School for seventh grade, for the 2020–21 academic year.[6]

---

indicates that he is set to graduate from 12th grade in May 2026. But the Board itself states that "This Court must decide the case exclusively on the basis of the record compiled before the State Board of Education hearing officer. 5 U.S.C. §§ 556, 706. Federal Rule of Appellate Procedure 16 defines the record on review as the agency order, findings, pleadings, evidence, and other materials from the agency proceeding, and treats the record before the agency and the record on review as the same. The reviewing court does not build a new factual record but evaluates the agency's action against the record that was before the agency when it acted." ECF No. 103 at 2 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) and *Camp v. Pitts*, 411 U.S. 138 (1973)).

Accordingly, the Court declines to consider a letter issued years after the relevant events in this case transpired—a letter, the Court notes, that was surely unavailable to the hearing officer in the underlying proceedings.

[2] *Id.*; *see also* Am. Compl., ECF No. 20 at 1.

[3] *See* ECF No. 104. Based on the Court's decision to permit the substitution of the plaintiff in this matter, it rejects as moot any arguments made by the Board in its papers based on the previous plaintiff's lack of standing.

[4] ECF No. 55-2 at 322–42; 368–70.

[5] *Id.* at 421.

[6] *Id.* at 526.

### 1.    Relevant IEPs

During the two-year period eligible for review by the hearing officer (December 8, 2018, to December 8, 2020), there were seven IEPs in place, dated: November 20, 2018; April 9, 2019; October 4, 2019; February 3, 2020; June 30, 2020; August 20, 2020; and October 8, 2020. The Court also considers an amendment to the October 8, 2020 IEP, dated January 26, 2021.

### a.    2018 IEP

The November 20, 2018, IEP outlined various goals and objective for S.B. It noted, in relevant part, that S.B. experienced some transitional issues with rigidity and "deficits in phonetic awareness and phonological processing," which led to issues with reading and communication.[7] As part of the IEP the Board agreed to the following conditions:

a.  One hour per week of counseling with the school counselor;

b.  Speech and language services once per week for 45 minutes, as well as making up 10 sessions that were not yet provided to S.B during the 2018–19 academic year;

c.  Evaluation of S.B. in the areas of speech and language by the Board's speech pathologist; and

d.  Developing a plan for S.B. to attend a social skills group, after continuing with the individual counseling that he was receiving.[8]

V.B. and R.B., at the 2018 IEP meeting, expressed concerns that evaluations planned at a prior PPT had not yet been conducted.[9] However, when they requested a speech and language IEE, counsel for the Board explained that there was no existing evaluation

---

[7] *Id.* at 102, 110.

[8] *Id.* at 102–03.

[9] *Id.* at 108, 103.

prescription with which the Board disagreed. The Board stated it would conduct its planned speech and language evaluation and advised S.B.'s parents that they could ask for an IEE should they disagree with results.[10]

### b.    2019 IEPs

The record reflects two IEPs issued in 2019, dated April 9 and October 4, respectively.

On April 9, 2019, S.B.'s PPT conducted an annual review of the child's progress.[11] The Southport staff reported that S.B. was making progress in all areas, including social/emotional goals, and that his academic scores had all improved.[12] However, the IEP also noted that S.B.'s phonological deficits impacted his ability to read and to communicate, as in November 2018.[13] The meeting participants discussed the provision of services for behavioral/academic instruction (30.75 hours per week), counseling (1 hour per week), and speech and language (45 minutes per week).[14] The PPT agreed on continued placement at Southport for the 2019-20 academic year, and, in the updated IEP, recommended, in relevant part, the following:

a.    Extended School Year ("ESY") at Southport for July 2019, plus tutoring by the Board for two weeks in August for math and reading; and

b.    A weekly social skills group for the summer and fall of 2019. The Board also agreed to reimburse V.B. and R.B. for weekly social group sessions to take place from April 9, 2019, through May 9, 2019.[15]

---

[10] *Id.* at 103.

[11] *Id.* at 152–186.

[12] *Id.* at 153.

[13] *Id.* at 162.

[14] *Id.* at 153.

[15] *Id.*

On October 4, 2019, the Board issued another IEP, which indicated that the Board would provide S.B. with weekly speech and language services and continued counseling and social skills sessions.[16] As part of the October 2019 IEP, the Board also agreed to provide S.B. with a neuropsychological evaluation, a speech language IEE, and a central auditory processing ("CAP") IEE.[17] As to S.B.'s progress, the October IEP also included reporting by S.B.'s counselor, who wrote that while S.B. continued to progress, gain self-confidence, and "[was] starting to feel success academically," he still struggled with rules and expectations and being a very rigid thinker.[18] Though the IEP noted that S.B. made good growth academically, that growth, with respect to math, was inconsistent, and S.B.'s phonological delays continued to impact his reading and communication.[19]

### c.    2020 IEPs

The Board issued four 2020 IEPs, on February 3, June 30, August 20, and October 8.

On February 3, 2020, the PPT and the Board convened another meeting at V.B. and R.B.'s request due to an allegation of bullying, and to discuss recommendations for S.B.'s upcoming reevaluation.[20] This meeting resulted in the first 2020 IEP. The team addressed S.B.'s parents' concerns about the bullying incident by adding a second weekly session of social skills training.[21] Otherwise, the February 2020 IEP remained largely the same as the

---

[16] *Id.* at 241–42.

[17] *Id.* at 241.

[18] *Id.*

[19] *Id.* at 245–46.

[20] *Id.* at 292–320.

[21] *Id.* at 293–94.

October 2019 IEP with respect to noting S.B.'s progress, again describing phonetic deficit affecting reading and communication and now noting S.B.'s social isolation and bullying.[22]

Shortly after the February 2020 IEP, schools across the country, including Southport, were shut down due to the onset of the COVID-19 pandemic. As a result, Southport experienced reduced staffing and services, and S.B. did not receive services between February and June of 2020.[23] The PPT meeting originally scheduled for March 24, 2020, was cancelled and not held until June 30, 2020, at which time it was held virtually. During the June 30, 2020, meeting, the Board and PPT reviewed S.B.'s progress reports, the completed evaluations,[24] and the evaluators' recommendations.[25] The IEP provides for speech and language services, expanded to include more reading and language support, and counseling and social skills training.[26]

The August 20, 2020 IEP, "held to review occupational therapist evaluation, discuss placement and make necessary revisions to IEP," resulted in S.B.'s placement being changed to the Easton Country Day School and the addition of occupational therapy.[27]

The October 8, 2020 IEP largely continued the same services as outlined in the August 2020 IEP.[28]

---

[22] *Id.* at 296.

[23] ECF No. 53 (Hearing Tr., Vol. I T92:18-T94:17; Vol. II T67).

[24] These evaluations are discussed in Section I.B.2, *infra*.

[25] ECF No. 55-2 at 420–51.

[26] *Id.* at 420–22.

[27] *Id.* at 477–512.

[28] *Id.* at 532–66.

All four 2020 IEPs noted phonological deficits, which affected reading and communication, just as prior IEPs indicated.[29]

On January 26, 2021, S.B.'s latest IEP (dated October 8, 2020) was amended to reflect implementation of auditory processing interventions.[30]

### 2.    Triennial Reevaluation and IEEs

In 2017 and mid-2018, S.B.'s PPT, with V.B. and R.B.'s consent, agreed that evaluations were needed for his Triennial Reevaluation for speech and language, central auditory processing, and academic achievement.[31] These evaluations were to be completed by June 7, 2018, when the Triennial was due.[32] However, by November 2018, the Board had still not performed any of the Triennial Reevaluations. As a result, V.B. and R.B. requested IEEs.[33] The Board failed to agree to fund the IEEs or to file for a due process hearing to determine that their actions were appropriate. Plaintiffs thus filed for an administrative due process hearing to obtain the IEEs on December 20, 2018. On April 17, 2019, the Board agreed to provide the IEEs.[34] As a result, the hearing officer in the due process hearing requested by V.B. and R.B. dismissed that case with prejudice, noting that the Board confirmed it would not pre-empt the IEEs with its own evaluations.[35]

---

[29] *Id.* at 296, 426, 483, and 537.

[30] ECF No. 39-10.

[31] ECF No. 39-5 at 2, 4–5.

[32] ECF No. 55-2 at 101.

[33] *Id.* at 218.

[34] *Id.* at 190–94.

[35] *Id.*

Shortly after the Board agreed to provide the IEEs, in email exchanges with the Board's administrators, V.B. and R.B. asked for an explanation of the procedure to engage independent evaluations and identified the evaluators they intended to use.[36] By October 2019, the IEEs had yet to be provided, and V.B. and R.B. brought these delayed IEEs up during a PPT meeting.[37] The Board insisted that these IEEs would now be part of S.B.'s next Triennial,[38] and insisted that they would thus not be completed and considered until March 2020, nearly three years after S.B.'s parents first consented to the Triennial.[39] As a result, S.B.'s speech and language and central auditory processing IEEs were not completed until February 2020, ten months after they were granted and five years after the last such evaluations of the student.[40] The academic IEE was never conducted, as the Board took the position that its neuropsychological evaluation (which was not an IEE) took its place since it contained an academic achievement component.[41]

### a.    Speech and Language IEE

The speech and language IEE, conducted by Dr. Nancy Schwartz, concluded that S.B. required more extensive speech services than those that had been provided to him by the Board.[42] Dr. Schwartz further concluded that S.B. had weaknesses in comprehension, maintaining cohesiveness in his extended language tasks, language organization, and word

---

[36] ECF No. 55-1 at 243.

[37] *Id.* at 256, 258; ECF No. 55-2 at 241.

[38] ECF No. 55-1 at 277; ECF No. 55-2 at 241.

[39] ECF No. 53 at 618–19.

[40] ECF No. 55-2 at 322–42, 344–54.

[41] *Id.* at 241.

[42] *Id.* at 322–342.

finding.[43] She further found that S.B.'s language deficits contributed significantly to his problems interpreting social scenarios and his interpretation of nonverbal communication.[44] And S.B.'s cognitive rigidity also contributed to his social struggles, as he had difficulties accepting other points of view or changing his plan.[45] Dr. Schwartz recommended, among other things, the following:

    e.  Individual speech and language services thirty minutes per week and speech services in a dyad twice per week for thirty minutes per session, for a total of 1.5 hours weekly;

    f.  Two twenty-minute individual social skills training sessions per week preceding two thirty-minute social skills dyad sessions, and one forty-five-minute small-group social skills session, for a total of 2.75 hours weekly; and

    g.  Auditory processing intervention twice per week for 15 minutes in addition to the interventions recommended by the central auditory processing evaluator.[46]

### b.    Central Auditory Processing IEE

The CAP IEE, conducted by Dr. Donna Geffner, established that S.B. required auditory processing services[47] that had never been provided to him despite earlier evaluations reaching the same conclusion.[48] She recommended a hearing aid device, as well as other interventions, to help with his auditory processing disorder.[49] The parents also privately retained audiologist

---

[43] *Id.* at 338–40.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 340.

[47] *Id.* at 344–354.

[48] ECF No. 55-1 at 574–75; ECF No. 55-2 at 42–43.

[49] ECF No. 55-2 at 350–53.

and speech and language pathologist Elizabeth D'Souza, who conducted her own assessment and reviewed Dr. Geffner's assessment to come up with a plan of necessary interventions.[50]

At the June 20, 2020 PPT meeting, the Board denied S.B.'s request for auditory processing services and requested more information about these services.[51] The Board again denied the request for auditory processing services at the August 20, 2020 PPT meeting, based on an alleged lack of information received about the services since the June meeting.[52] The October 8, 2020 IEP once again denied the request and indicated that the Board needed more information to decide upon auditory services. At this meeting, the Board also considered the proposal of necessary interventions put forth by Dr. D'Souza. The proposal recommended an hour per week of direct service, as well as collaboration with the speech and language provider: recommendations that were the same as those made by Dr. Geffner.[53]

The October 8, 2020, IEP noted that the Board agreed to contact Dr. Geffner and Ms. D'Souza to discuss plans to incorporate interventions. Yet the Board also stated, prior to the October 8 PPT meeting, that the audiologist's presence was not needed at that meeting.[54] On November 3, 2020, the Board indicated in email correspondence to V.B. that it was still "researching the services and specific recommendations [Dr. Souza] made at the [October 8] PPT, as well as the revisions to her original recommendations which she provided…following

---

[50] ECF No. 100 at 11.

[51] *Id.* at 420–25; ECF No. 53 at 302–04.

[52] ECF No. 55-2 at 477–82; ECF No. 53 at 651–53, 805.

[53] ECF No. 55-2 at 39.

[54] *Id.* at 43.

the PPT" and that the Board was "awaiting additional information."[55] On November 10, 2020, V.B. again indicated to the Board that she was unclear as to "what *additional* information" the Board needs to discuss auditory processing services.[56]

The Board finally agreed to provide auditory processing services as part of S.B.'s IEP by a written amendment dated January 2021, including thirty minutes per day of the CAPDOTS[57] program and one hour per week of auditory processing intervention.[58]

### c.    Neuropsychological Evaluation

As part of the October 2019 IEP, as mentioned the Board agreed to provide S.B. with a neuropsychological evaluation.[59] In order for the evaluation to proceed, V.B. signed a consent form for a neuropsychological evaluation to be conducted by Dr. Stacey Aronson. The consent specified that Dr. Aronson would complete a comprehensive evaluation including cognitive, achievement, executive functioning, and social emotional testing.[60]

In March 2020, S.B. underwent a neuropsychological evaluation by Dr. Stacey Aronson. She found that S.B.'s general cognitive functioning in the verbal and nonverbal are in the average range but working memory and processing speed were in the below-average range.[61] The evaluation also revealed functional communication difficulties and weaknesses

---

[55] ECF No. 55-1 at 575.

[56] *Id.* at 574.

[57] *CAPDOTS*™ is an on-line auditory training system for the treatment of Central Auditory Processing Disorders. *See* https://www.capdots.com (last visited March 29, 2026).

[58] ECF No. 39-10.

[59] *Id.* at 241.

[60] *Id.* at 268.

[61] ECF No. 55-2 at 356–77.

in phonological skills. Dr. Aronson found that, though S.B. made great gains at Southport, reading and spelling remained difficult.[62] She also found that, though S.B.'s math skills were solidly in the average range, he was slower on math fluency tasks.[63]

### d.    Private Math Evaluation

In light of the Board's refusal to provide an academic IEE, V.B. and R.B. also elected to conduct a private math evaluation of S.B. in August 2020.[64] The evaluation, completed by Dr. Randy Ewart, concluded that the math section of S.B.'s IEP was inappropriate and would not result in progress.[65] The Board did not reimburse V.B. and R.B. for this evaluation.[66]

### 3.    Provision of Speech and Language Services

Due to S.B.'s language-based disability and difficulty with social skills, speech therapy had historically been an important component of his educational program.[67] Going into the 2018–19 school year, among other accommodations, S.B.'s IEP required that the Board provide him with weekly 45-minute speech and language services.[68] But as of November 20, 2018 IEP meeting date, a few months into the school year, the Board had failed to provide any of the 10 speech therapy sessions to which S.B. was entitled.[69] Additionally, the Board failed

---

[62] *Id.*

[63] *Id.*

[64] ECF No. 55-2 at 1–34.

[65] *Id.* at 24–26.

[66] ECF No. 102 at 10.

[67] ECF No. 55-2 at 322–25.

[68] *Id.* at 103.

[69] *Id.*

to provide any speech and language services during the summer of 2019.[70] During the 2019–20 school year, the Board delivered only seven speech and language sessions.[71] The Board delivered no such services once the COVID-19 pandemic began.[72] It provided no compensatory speech and language services to make up for the missed sessions.[73] In sum, Plaintiff alleges that "[d]uring the [seventy] weeks of instruction from the beginning of the limitations period to when speech services commenced – December 2018 to June 2020 – SB should have received [seventy] sessions of speech and language therapy," but he received only seven.[74]

### 4.    Underlying Administrative Hearings

V.B. and R.B. filed their request for a due process hearing on December 8, 2020, and were unrepresented in the administrative due process hearings before the State of Connecticut Department of Education, proceeding *pro se*.[75] Hearings took place on February 16, 2021, March 31, 2021, April 23, 2021, May 20, 2021, June 9, 2021, June 29, 2021, July 30, 2021, and August 3, 2021.[76]

The Court notes that tone is difficult to assess from a written transcript, and it therefore does not determine whether the hearing officer's comments toward the parents rose to the level

---

[70] *Id.* at 183; ECF No. 55-1 at 263–67, 284–88.

[71] ECF No. 55-1 at 263–64, 604, 642–44, 646–67.

[72] ECF No. 53 at 251–52.

[73] ECF No. 55-1 at 263–67, 284–88.

[74] ECF No. 102 at 4.

[75] ECF No. 100.

[76] ECF No. 55-2 at 666.

of animosity claimed by Plaintiff in their brief.[77] The record does reflect, however, that the hearing officer was at times impatient, curt, and dismissive in her exchanges with V.B. and R.B. Regardless of whether that demeanor motivated the rulings at issue, the transcript demonstrates that the hearing officer excluded relevant evidence and curtailed the parents' ability to present probative testimony bearing directly on the issues before the agency.

At the outset, V.B. disclosed that she had a learning disability requiring additional processing time. Nevertheless, the hearing officer cut short her opening statement as improper testimony and prohibited her from using notes during her own testimony, warning that doing so could result in her testimony being stricken.[78] The hearing officer did not allow V.B. to use an outline or notes for her testimony, and cautioned her that if the hearing officer caught V.B. reading her notes, her testimony would be stricken.[79] She further precluded the admission of a document in which R.B. and V.B. summarized some concerns they had going into S.B.'s June 2020 IEP meeting, characterizing it as hearsay and irrelevant.[80] Meanwhile, the hearing officer allowed counsel for the Board to read off of "documents," stating that counsel could "refer to the evidence that [was] being brought into this case," though the documents counsel was reading from had not yet been admitted into evidence.[81]

---

[77] ECF No. 82-1 at 8.

[78] ECF No. 53 at 11–12, 59–60.

[79] *Id.* at 440.

[80] *Id.* at 629–39.

[81] *Id.* at 486.

The hearing officer also limited discussion of S.B.'s IEEs, characterizing V.B.'s efforts to obtain them as "an awful lot of back and forth."[82] She stated that the state complaint dismissed with prejudice upon the Board's commitment to provide IEEs was "not important anymore because it sounds like the [speech and language] evaluation at least was conducted," despite V.B.'s repeated attempts to make clear that the academic IEE, which the Board had agreed to conduct, was never conducted.[83] When V.B. sought guidance on how to present her case as a *pro se* parent, the hearing officer declined to provide any practical direction beyond stating that only what was permissible "under the rules"—presumably the Regulations of Connecticut State Agencies, which govern special education proceedings—would be allowed.[84] But V.B. responded that those rules did not, in fact, provide the procedural guidance she was seeking.[85]

The hearing officer issued her final decision on December 15, 2021.[86] She made eight conclusions, discussed in further detail below. The hearing officer concluded that the Board did not commit procedural violations and generally offered S.B. a FAPE, but found a limited denial of FAPE between February 2020 and June 2020 due to the Board's failure to provide all required speech and language services during COVID-19 school closures. As a remedy, the hearing officer awarded compensatory education in the form of twenty-four speech and language sessions of an undetermined length and denied all other requested relief, including

---

[82] *Id.* at 488.

[83] *Id.* at 488.

[84] *Id.* at 502, 504.

[85] *Id.* at 506.

[86] ECF No. 55-2 at 665.

reimbursement and additional compensatory services. Plaintiff challenges numerous findings of fact as well as seven of the hearing officer's eight conclusions.[87]

## II.    DISCUSSION

The standard for determining whether a Board has provided FAPE is set forth in a two-part inquiry: first, whether the Board complied with the procedural requirements in the IDEA, and second, whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 208 (1982). The Board has the burden of proving the appropriateness of the program and placement they have offered by a preponderance of the evidence. *See* R.S.A. § 10-76h-14(a); *see also Walczak v. Fla. Free Union Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998).

"Federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir. 2018) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 113 (2d Cir. 2007)) (cleaned up). "Deference to the administrative decision is particularly appropriate when the administrative officer's review has been thorough and careful, and when the court's decision is based solely on the administrative record. *Id.* (citing *M.H.*, 685 F.3d at 241). While this Court "do[es] not simply rubber stamp administrative decisions," *Walczak*, 142 F.3d at 129, review of the administrative decision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

---

[87] ECF No. 20 at 2–3.

But when an administrative opinion in an IDEA due process hearing "is not supported by a preponderance of the relevant evidence…the Court does not defer to [the hearing officer's] analysis." *Mr. O. v. Glastonbury Bd. of Educ.*, No. 20-CV-690 (VAB), 2021 WL 6134691, at \*10 (D. Conn. Dec. 29, 2021) (citing *E.H. v. N.Y.C Dep't of Educ.*, 164 F. Supp. 3d 539, 553 (S.D.N.Y. 2016) ("In light of the fact that the [hearing officer] failed to analyze the record to answer the relevant question of whether the Parent was denied meaningful opportunity to participate with respect to her concern that [the student] required a more restrictive setting…the [hearing officer's] finding is not supported by a preponderance of the relevant evidence….")); *see also C.F. ex rel. R.F. v. N.Y.C Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (holding that courts need not defer to a decision that is "insufficiently reasoned"); *J.M. v. N.Y.C Dep't of Educ.*, No, 12-CV-8504, 2013 WL 5951436, at \*17 (S.D.N.Y. Nov. 7, 2013) (holding that a hearing officer's opinion "does not warrant deference from the Court" if it is not "analytically intensive," even if it is "long in its recitation of the testimonial evidence.").

Here, the Court concludes that the hearing officer's decision is not supported by a preponderance of evidence and thus does not defer to it. The Court finds numerous contradictory findings of fact, as well as those that are unsupported or contrary to the record. For example, the hearing officer concluded that the services listed in the November 2018 IEP, including speech and language services and the provision of a speech and language IEE, "were agreed to by the PPT team and implemented during the 2018–19 school year."[88] The hearing officer made a similar statement about services, including speech and language, "being

---

[88] ECF No. 55-2 at 668 ¶ 9.

provided and continuing to be provided" at the April 2019 IEP.[89] But as the parents alleged in the underlying proceeding, no speech language services had been provided during the 2018–19 school year, and the speech and language IEE was not conducted until over a year later. A few paragraphs later, in fact, the decision concedes that the pandemic affected the provision of speech and language services to S.B. "which had just begun."[90] Further, the findings of fact overlook any distinction between Board-ordered evaluations and the IEEs requested by the parents.[91]

The Court also finds the hearing officer's conclusions of law were not supported by a preponderance of the evidence. These conclusions consist largely of boilerplate language and three general paragraphs, seemingly tailored to S.B.'s case. But these three paragraphs lack any analysis and ties to the evidence presented. Thus, the Court does not defer to the hearing officer's decision and relies entirely on the A.R.

Plaintiff argues that the hearing officer's decision should be reversed because the Board committed various procedural violations, that ultimately resulted in substantively inadequate IEPs. Based on the procedural violations and the substantively inadequate IEPs, plaintiffs argue that the Board failed to provide S.B. with a FAPE for the 2018–19, 2019–20, and 2020–21 academic years. The Court thus undertakes a two-level review: first, it analyzes whether the Board has complied with IDEA's procedural requirements; second, it determines whether the IEPs at issue are "reasonably calculated to enable [S.B.] to make progress appropriate in

---

[89] *Id.* at 668–69 ¶ 14.

[90] *Id.* at 669 ¶ 21.

[91] *Id.* at 669 ¶ 15.

light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE–1*, 580 U.S. 386, 387 (2017).

## A.    Procedural Violations

A Court's "procedural inquiry is no mere formality." *Walczak,* 142 F.3d at 129. "A procedural violation of the IDEA entitles a plaintiff to relief only if it: '(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits.'" *Mr. P*, 885 F.3d at 748 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii) and citing *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 535 (2d Cir. 2017). "That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *A.M.*, 845 F.3d at 535 (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013)). "Multiple procedural violations…may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *Id.* (quoting *L.O. v. N.Y.C. Dep't of Educ.,* 822 F.3d 95, 123 (2d Cir. 2016)) (cleaned up).

Accordingly, the Court reviews the hearing officer's challenged conclusions, which, according to Plaintiff, rejected most of the parents' procedural challenges, and, in holding that any procedural violations did occur, provided for insufficient relief.[92] Plaintiff alleges that the

---

[92] The hearing officer's eighth conclusion, that the "Board did not change [S.B.'s] placement and/or IEP without PPT discussion" is not challenged by Plaintiff. ECF No. 55-2 at 667.

Board committed several procedural violations that denied S.B. a FAPE, including (i) the failure to conduct a timely Triennial Reevaluation; and (ii) the delay in IEEs.[93]

### 1.    Triennial Reevaluation

First, Plaintiff alleges that the Board violated the IDEA's Triennial Reevaluation requirement by failing to conduct the reevaluation due in 2018 in a timely manner.

The Triennial Reevaluation, as implied by its name, and per the IDEA, must be conducted at least once every three years, unless the parent and PPT agree it is unnecessary. 20 U.S.C. § 1414(a)(2)(B); 34 C.F.R. § 300.303(b)(2). As recounted above, the Student's Triennial Reevaluation was due in June 2018, with his last Triennial having been conducted in 2015. Both his parents and PPT agreed. In March and September 2017 and in July 2018, V.B. provided signed consent forms for a speech and language evaluation, an academic evaluation, and a central auditory processing evaluation.[94] By November 2018, five months after the Triennial was due and four months after V.B. signed the last of the consent forms, the Board did not undertake any of the evaluations.

Because of the Board's inaction, in November 2018, V.B. and R.B. requested IEEs in speech and language, auditory processing, and academic achievement. The Board took no

---

[93] In reviewing whether procedural violations of the IDEA occurred, the Court notes the following procedural conclusions drawn by the hearing officer:

- One: "The Board did not commit procedural violations during the school years 2018–19, 2019–20, and 2020–21 which would have denied him a [FAPE]."

- Four: "The board conducted evaluations in a reasonable timeframe after [V.B. and R.B.] signed consent for [S.B.] to be evaluated in the areas of speech and language social, auditory processing and academic achievement." ECF No. 55-2 at 676–77.

[94] ECF No. 39-5 at 2, 4–5.

action. In December 2018, V.B. and R.B. filed a due process complaint. That complaint was dismissed in April 2019, when the Board issued a letter agreeing to provide the requested IEEs. That letter did not result in the prompt provision of IEEs. Instead, over the ensuing months, V.B. repeatedly sought the Board's IEE criteria and asked the Board to contract with approved evaluators and filed a State Complaint when the Board failed to respond. The Board finally agreed to provide the IEEs only after this State Complaint was filed; the Complaint was dismissed, in fact, only based on the Board's agreement. Yet, even after agreeing to do so, the Board still did not engage the Parent's chosen evaluators and instead attempted to fold one of the requested IEEs into a Board-conducted reevaluation.

Thus, evaluations essential to the 2018 Triennial Reevaluation were not completed until February 2020, or, in the case of the academic evaluation, not at all. And as of 2021, the recommendations that came out of these evaluations were still being implemented. The Board's failure to complete the required evaluations by the June 2018 deadline constitutes a clear and significant procedural violation of the IDEA's three-year reevaluation mandate. The delay of over a year and a half was not a harmless procedural misstep. As addressed in further detail below, when the evaluations were ultimately completed, they revealed significant, unaddressed educational needs, demonstrating that the Board's procedural violation impeded S.B.'s right to a FAPE and caused a deprivation of educational benefits throughout the 2018–19, 2019–20, and 2020–21 school years.

### 2. IEE Provision

Plaintiff next contends that the Board failed to provide IEEs in an appropriate manner by failing to conduct two requested IEEs in a timely manner and by failing to conduct a third IEE altogether.

Federal regulations dictate that "[i]f a parent requests an [IEE]…the public agency may not require the parent to provide an explanation and *may not unreasonably delay* either providing the independent educational evaluation at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation." 34 C.F.R. § 300.502(b)(4) (emphasis added).

The Board sets forth no facts explaining why the delay between when V.B. and R.B. requested the IEEs—November 2018—and when the speech and language and CAP IEEs were finally conducted—February 2020—was reasonable. The Court finds the delay in providing S.B. with IEEs to be particularly unreasonable given that the Triennial Reevaluation was due in June 2018. The November 2018 PPT had agreed that evaluations in speech and language, academic achievement, and CAP were necessary, and the Board's refusal to conduct those evaluations was the sole reason V.B. and R.B. requested IEEs in the first place.[95] The delay was further compounded when, after V.B. and R.B. filed a due process complaint in December 2018, the Board secured dismissal of that complaint by agreeing to provide the IEEs, only to later withhold them and attempt to defer evaluation until the next triennial cycle—an approach that would have left S.B. without required evaluations for approximately six years, from 2015 to 2021. Even setting aside the initial delays, the Board's failure to act for ten months after formally agreeing to provide the IEEs in April 2019 was, in and of itself, plainly unreasonable.

Further, the Board's explanation as to the lack of provision of an academic IEE is unavailing. The Board claims that the neuropsychological evaluation conducted by Dr. Aronson contained an academic achievement component. But even assuming this academic

---

[95] ECF No. 55-2 at 102–03.

component was comparable to that of an academic achievement IEE, the fact of the matter remains the same: the Board unequivocally agreed to perform an academic achievement IEE and Dr. Aronson's evaluation was simply not an IEE. And the Board has not attempted to show, in any serious manner, that the academic component of the neuropsychological evaluation was, in fact, comparable to a full-on reading, writing, and math academic IEE. Nor does the Court find the Board's conclusory assertion that "it complied with its agreement to fund an IEE in the areas of central auditory processing disorder, academic achievement (reading, writing, and math) and speech and language" persuasive.[96] Indeed, the Board cites to no such evaluation, and instead proceeds to discuss the math evaluation conducted by Randy Ewart, who the parents *privately retained*.

Thus, the Court finds that the Board indeed failed to provide S.B. with IEEs in an appropriate manner. As explained below, the belated evaluations revealed substantial, unaddressed needs that had persisted for years, demonstrating that the Board's procedural violation impeded S.B.'s right to a FAPE and deprived him of educational benefits throughout the 2018–19, 2019–20, and 2020–21 school years.

### 3.     Cumulative Effect

There are multiple procedural violations present, as discussed, in the IEPs spanning the 2018–19, 2019–20, and 2020–21 academic years. The Court concludes that the Board violated the procedural requirements of the IDEA by failing to conduct a timely Triennial Reevaluation, by failing to provide two IEEs in an appropriate manner, and by failing to provide the academic IEE at all. The Court further determines that these violations—both individually and

---

[96] ECF No. 103 at 7.

collectively—denied S.B. a FAPE during those academic years. In particular, the violations, taken together, resulted in plans based on outdated and incomplete data, which ultimately deprived S.B. of a FAPE.

S.B. was entitled to an IEP designed by the Board and "reasonably calculated to enable [him] to make progress appropriate [to his] circumstances." *Endrew F.*, 580 U.S. at 403. "An IEP based on stale information, without the benefit of *any* recent educational progress metrics or evaluations, cannot be reasonably calculated to ensure appropriate progress." *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15-CV-2042, 2017 WL 3037402, at *21 (S.D.N.Y. July 17, 2017) (citing *E.H.*, 164 F. Supp. at 556 ("By using goals that were designed to expire by the time the IEP was to implement them (for a full year thereafter), the DOE has not shown that the IEP was likely to produce progress.")); *see also Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F. Supp. 2d 236, 240 (S.D.N.Y. 2000) (noting that the IDEA requires the IEP to be "reviewed and revised each school year").

As noted, during the two-year period eligible for review by the hearing officer (December 8, 2018, to December 8, 2020), there were seven IEPs in place, dated November 20, 2018; April 9, 2019; October 4, 2019; February 3, 2020; June 30, 2020; August 20, 2020; and October 8, 2020.[97] The Court also considers an amendment to the October 8, 2020 IEP, dated January 26, 2021. Because the CAP and speech and language evaluations were not conducted until February 2020, the first four of these IEPs could not have possibly considered the findings made by these IEEs. The last such evaluations of S.B. had been conducted in

---

[97] *See* Section I.B.1, *supra*.

2015.[98] That means the November 20, 2018; April 9, 2019; October 4, 2019; and February 3, 2020, IEPs were crafted relying on evaluations that were anywhere between three and five years old. Moreover, because no academic achievement IEE was ever conducted, none of these IEPs relied on any such assessment data; at most, the final two IEPs reflected consideration of Mr. Randy Ewart's private math evaluation.

Under *Endrew F.*, that is not sufficient. 580 U.S. at 387. An IEP must be grounded in a student's present levels of performance and reasonably calculated, at the time it is drafted, to enable appropriate progress. *See Avaras,* 2017 WL 3037402, at *21. Here, the Board failed to conduct updated evaluations despite ongoing academic and communication concerns. Thus, the resulting IEPs necessarily lacked critical information about S.B.'s auditory processing deficits, expressive and receptive language weaknesses, and related impact on reading and written expression. The February 2020 CAP and speech-language evaluations confirmed deficits that had not been meaningfully addressed in the earlier IEPs and ultimately led to the provision of auditory processing services in 2021, along with additional speech-language and academic supports. The fact that those services were later deemed necessary underscores that the earlier IEPs—crafted without current evaluative data—were not reasonably calculated to confer appropriate progress at the time they were developed.

The updated evaluations in this case revealed material, unaddressed needs that resulted in new and intensified services—services that, had the Board complied with its reevaluation obligations, could have been implemented as early as 2018. By relying on evaluative data that

---

[98] ECF No. 55-2 at 323.

was three to five years out of date, the Board failed to design IEPs that were responsive to

S.B.'s then-current circumstances, thereby denying him a FAPE during the period at issue.

"The initial procedural inquiry in an IDEA case is no mere formality, as adequate

compliance with the procedures prescribed would in most cases assure much if not all of what

Congress wished in the way of substantive content in an IEP." *L.O.*, 822 F.3d at 124 (2d Cir.

2016) (cleaned up). The Court's procedural inquiry has revealed serious deficiencies resulting

in deprivation of a FAPE to S.B. The Court further concludes that the hearing officer's findings

as to alleged procedural violations of the IDEA by the Board, to the extent they held otherwise,

were erroneous and are reversed.

### B.    Substantive Violations

As to substantive violations, Plaintiff asserts that the relevant IEPs were not

implemented in a reasonable or proper manner with respect to S.B.'s auditory processing

disorder and his speech and language needs. Thus, Plaintiff argues, these violations resulted in

substantively inadequate IEPs. [99]

---

[99] The Court considers the following substantive conclusions made by the hearing officer:

- Two: "The Board did not offer [S.B.] a program that would provide him with FAPE for the periods from December 2018 to December 2020 including Extended School Years because it failed to provide [S.B.] with all agreed-on sessions of Speech and Language services in 2020 due to the COVID-19 emergency. Accordingly, compensatory education is awarded in the form of 24 sessions of Speech & Language services."

- Three: "There was no evidence presented to substantiate that FAPE was denied as a result of any claimed failure to evaluate [S.B.]."

- Five: "The board did not fail to timely provide [S.B.] with an appropriate accommodation, i.e., an auditory processing device."

- Six: "The Board failed to provide appropriate related services in the form of Speech and Language services, social skills services and counseling services to [S.B.] from February to June, 2020, due to the COVID-19 statewide school closures."

With respect to substantive adequacy, the "IDEA does not require that an IEP furnish 'every special service necessary to maximize each handicapped child's potential.'" *A.H. ex rel. J.H. v. Dep't of Educ.*, 394 F. App'x 718, 721 (2d Cir. 2010) (quoting *Rowley,* 458 U.S. at 199). Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Id.* (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d at 254) (cleaned up); *see also Cerra v. Pawling Cent. School Dist.,* 427 F.3d 186, 195 (2d. Cir. 2005). But it also "cannot be the case that the [IDEA] typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot." *Endrew F.*, 580 U.S. at 402. "The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 403.

### 1.    Failure to Implement IEP-Designated Services

First, by way of alleging substantive violations of the IDEA, Plaintiff alleges that the Board failed to properly implement numerous IEPs by failing to provide required speech and language services contained within those very IEPs.

"[F]ailure to comply with the speech-language therapy provision for students with autism…constitutes a serious violation of the procedures of the IDEA." *L.O.*, 822 F.3d at 115.

---

- Seven: "The Board failed to implement one or more of [S.B.'s IEPs] in the school years 2018–19, 2019–2020, and 2020–2021, including [ESY] programs due to its not providing Speech and Language services to [S.B.] from February to June, 2020." ECF No. 55-2 at 676–77.

"This is because central to the provision of a student's special education is his or her communicative functioning, including speech and language instruction." *Id.*

Here, the Board failed to meaningfully provide S.B. with speech and language services for nearly two years, during seventy weeks of instruction. The IEPs spanning those years reflect continued phonetic deficits which affected S.B.'s reading and communication skills.[100] As in *L.O.*, the Board's omission concerned a service that went to the heart of S.B.'s ability to communicate and access instruction; the deprivation was not peripheral to his program but directly undermined his documented areas of need. *L.O.* dealt with a school district's failure to comply with a New York City law that mandated daily speech and language services for certain children. The Second Circuit's reasoning therein is even stronger here, when applied to a school district that acknowledged a student's need for speech language services, included these services in the student's IEP, and then failed to provide them. Thus, the Board's substantive violation in failing to provide required speech and language services was a serious one, depriving S.B. of important educational benefits to which he was entitled by law and thus depriving him of a FAPE.

The hearing officer in the underlying proceedings acknowledged only that the Board failed to provide S.B. with the agreed-upon speech and language sessions during the onset of the COVID-19 emergency. It thus awarded S.B. compensatory education in the form of twenty-four sessions of speech and language services. However, the Court finds the violation was not confined to the period surrounding the COVID-19 emergency. To the extent S.B. was entitled to seventy sessions but only provided with seven during the relevant time period, as

---

[100] *See* Section I.B.1, *supra.*

Plaintiff alleges, an award of twenty-four such sessions is inadequate, and does not remedy the substantive violation at hand.

### 2.      Delay in Implementing IEE-Recommended Services

Plaintiff also argues that the Board's failure to timely implement S.B.'s CAP IEE was an additional substantive violation resulting in a denial of FAPE to S.B.

A "school *must* consider an IEE in any decision made with respect to the provision of FAPE to the child, 34 C.F.R. § 300.502(c)(1)." *D.S.*, 975 F.3d at 157–58 (cleaned up and emphasis added). Where a district becomes aware of a new evaluation identifying additional disabilities and recommending corresponding classification but fails to update the student's IEP to reflect that information or otherwise incorporate the evaluator's findings, the district denies the student a FAPE because the IEP is not based on current, accurate evaluative data and does not address all of the student's identified needs. *See Avaras*, 2017 WL 3037402, at *21 (finding that where a school district became aware of an evaluation that reflected additional disabilities while designing an IEP and did not update the IEP to incorporate said evaluation, this rendered the IEP deficient); *See also D.S. ex rel. Clarenore S. v. Dep't of Educ., Hawai'i*, No. 12-CV-533, 2013 WL 6047200, at *3, 5 (D. Haw. Nov. 14, 2013) (where a school district developed IEPs but failed to "consider the most recent information available," "that [s]tudent was denied a FAPE…").

"[T]he IDEA does not require a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities." *H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *16 (S.D.N.Y. May 24, 2012), *aff'd sub nom. H.C. ex rel. M.C. v. Katonah–Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64 (2d Cir. 2013); *see A.H.* 394 F. App'x at 721 ("IDEA does not

require that an IEP furnish every special service necessary to maximize each handicapped child's potential."). "A school district does not fail to provide a child with a FAPE simply because it employs one assistive technology over another, so long as the technology employed is reasonably calculated to permit the child to receive educational benefits." *L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F. Supp. 3d 235, 263 (S.D.N.Y. 2023) (quoting *H.C.*, 528 F. App'x at 67).

As recounted above, S.B.'s central auditory processing IEE was finally completed in February 2020. The CAP IEE concluded that S.B. continued to exhibit a central auditory processing disorder, first diagnosed in 2013, with deficits in phonological processing, short-term memory, and auditory and temporal processing, and recommended targeted auditory processing intervention, specialized, and classroom supports. The speech-language IEE, conducted contemporaneously, likewise identified significant expressive, receptive, and social-pragmatic language deficits and recommended substantially increased speech-language therapy, structured social skills instruction, and additional auditory processing intervention to address the impact of these deficits on S.B.'s academic and social functioning.

Shortly after the IEEs occurred, COVID-19 hit. As a result, a PPT meeting for S.B. originally scheduled for March 24, 2020 was cancelled and not held until June 30, 2020. Although the CAP and speech and language IEEs both concluded that S.B. required auditory processing services, the Board repeatedly denied those services at PPT meetings in June, August, and October 2020, citing a lack of information about the services. The Board delayed implementing the services into S.B.'s IEP until January 2021—almost a year after the IEE was completed.

33

The Board argues that it did not ignore the February 2020 CAP IEE but instead sought additional information from Dr. Geffner and Dr. D'Souza before incorporating auditory processing services into S.B.'s IEP. The record does reflect repeated statements, at the June, August, and October 2020 PPT meetings, that the Board required more information before acting. The Board's claim that it needed more information, however, is unpersuasive, as it failed to articulate what information was lacking or why it took eleven months to act, all while being aware of S.B.'s documented difficulties. It failed to do so—the Court notes—even when V.B. repeatedly inquired as to what information the Board was missing to make its decision. This inaction is especially unreasonable given that the Board was on notice of S.B.'s auditory processing difficulties as early as 2013.

The IDEA requires a district to meaningfully consider an IEE in decisions regarding FAPE. *See D.S.*, 975 F.3d at 157–58. Here, the CAP IEE confirmed a long-standing auditory processing disorder and recommended specific services, and by October 2020, the Board had before it consistent written recommendations as to next steps. Yet, three successive IEPs omitted any auditory processing intervention, without identifying alternative supports to address that need. S.B.'s auditory processing deficits directly affected his phonological processing, reading fluency, and communication—areas repeatedly noted in his IEPs as ongoing concerns. By declining to implement targeted auditory processing intervention, the Board left those deficits unaddressed, thereby impeding S.B.'s ability to access instruction and make appropriate progress. The omission therefore resulted in a substantive denial of FAPE during the period in which those IEPs were in effect.

For the foregoing reasons, the Court concludes that the Board committed substantive violations of the IDEA which denied S.B. a FAPE. The hearing officer's conclusions, to the extent they found otherwise, were erroneous. The Court thus reverses these conclusions.

## III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment. This case is **REMANDED** for further proceedings consistent with the determinations made in this order. Specifically, on remand, the hearing officer shall determine the proper remedy consistent with the Court's adjudication that there were procedural and substantive violations of the IDEA in S.B.'s case. The Clerk is directed to enter judgment in favor of Plaintiff and close this case.

**SO ORDERED.**

Hartford, Connecticut
March 30, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

35